**CENTRAL STATES ENTERPRISES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**No. 84–2005.**

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1985.

Decided Dec. 23, 1985.

Rehearing Denied Jan. 27, 1986.

---

Carl M. Miller, Miller & Miller, New Haven, Ind., for petitioner.

Charles M. Rosenberger, Seaboard System R.R. Inc., Jacksonville, Fla., John J. McCarthy, Jr., I.C.C., Office of Gen. Counsel, Washington, D.C., for respondents.

* The Honorable Reynaldo G. Garza, Senior Circuit Judge of the United States Court of Appeals

Before CUDAHY and COFFEY, Circuit Judges, and GARZA, Senior Circuit Judge.*

COFFEY, Circuit Judge.

The petitioner, Central States Enterprises, Inc. ("Central"), requests that this court review the decision of the Interstate Commerce Commission ("Commission") denying Central's request for reciprocal switching and joint use of terminal services at Central's grain elevator located within the city limits of Camilla, Georgia. We deny Central's request to review the Commission's decision.

I

A. *Introduction*

The record reveals that Central presently operates grain elevators in Fort Wayne, Indiana and Camilla, Georgia. The Fort Wayne elevator purchases corn for export overseas and for bulk sales to feed industry, while the Camilla elevator sells smaller quantities of corn to the feed industry in the southeastern part of the United States. Central's Fort Wayne grain elevator is located adjacent to the tracks of the Southern Railroad, Inc. ("Southern") and Central's grain elevator in Camilla is located next to the tracks of the Seaboard System Railroad, Inc. ("Seaboard"), 1.4 miles from the point where the Seaboard and Southern tracks intersect. Central wants to ship corn directly from the grain elevator in Fort Wayne, Indiana to its grain elevator in Camilla, Georgia. In order for the corn to be shipped over rail directly from Central's elevator in Fort Wayne to its elevator in Camilla, Georgia, Seaboard's switching engines could pull the Southern train cars for the remaining 1.4 mile stretch of track from the intersection of the Southern and Seaboard Railroads to Central's Camilla grain elevator. This arrangement is

for the Fifth Circuit, is sitting by designation.

termed a reciprocal switching agreement.[1] In the alternative, Seaboard could allow Southern to complete the entire journey from Fort Wayne to Central's Camilla grain elevator by allowing Southern to pull its own train cars over the 1.4 miles of Seaboard's tracks. This is labeled a joint use agreement. The record presented to the Commission is not as detailed as it might be as to how the corn is presently received at Central's Camilla grain elevator, but Central apparently ships most of its corn via Southern Railroad from Fort Wayne to the intersection of the Southern and Seaboard tracks outside of Camilla, Georgia. The corn is then transported in trucks across town to its grain elevator. Once the corn reaches Central's grain elevator in Camilla, Georgia, the Seaboard Railroad transports the corn to the feed markets in the Southeastern United States.[2]

### B. *Statutory Background*

 Central commenced this action, pursuant to 49 U.S.C. § 11103(a) and (c), seeking an order from the Commission requiring that Seaboard open the 1.4 mile stretch of track leading to Central's elevator in one of two ways, either requiring Seaboard to enter into a reciprocal switching agreement, or a joint use agreement, with Southern Railroad. Section 11103(a) governs joint use agreements and provides, in part, that:

> "The Interstate Commerce Commission *may* require terminal facilities, including main-line tracks for a reasonable distance outside of a terminal, owned by a rail carrier providing transportation subject to the jurisdiction of the Commission ... to be used by another rail carrier if

the Commission finds that use to be *practicable and in the public interest* without substantially impairing the ability of the rail carrier owning the facilities or entitled to use the facilities to handle its own business...."

49 U.S.C. § 11103(a) (1985) (emphasis added). While Section 11103(c)(1), which governs reciprocal switching agreements, provides:

> "The Commission may require rail carriers to enter into reciprocal switching agreements, where it finds such agreements to be *practicable and in the public interest, or* where such *agreements are necessary to provide competitive rail service.* The carriers entering into such an agreement shall establish the conditions and compensation applicable to such agreement, but, if the carriers cannot agree upon such conditions and compensation within a reasonable period of time, the Commission may establish such conditions and compensation."

49 U.S.C. § 11103(c)(1) (1985) (emphasis added). Subsection (c) of section 11103 was added to the statute in 1980, as part of the Staggers Railroad Act, in order to clarify the Commission's power to require reciprocal switching agreements. Both subsections (a) and (c) provide that the Commission "may" order relief in the form of a joint use or switching agreement where it is "practicable and in the public interest." Congress intended that the standard to be used in applying the "practicable and in the public interest" test be "the same standard the Commission has applied in considering whether to order the joint use of terminal facilities." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 116–17, *reprinted in* 1980 U.S.

---

**1.** As both parties agreed at oral argument, the proposed switching agreement is not truly "reciprocal" as the Commission has the power to order a railroad to enter into a switching agreement without requiring the benefiting railroad to reciprocate by opening one of its tracks to switching. As described in *Switching Charges and Absorption Thereof at Shreveport, La.,* 339 I.C.C. 65 (1971):

> "In practice [a reciprocal switching agreement] means that one line-haul carrier operating within the terminal area will act only as a

switching carrier in placing cars at industries on its own trackage for loading or unloading, as an incident of the line-haul movement of those cars over another carrier whose trackage in that terminal area does not extend to the serviced industry."

*Id.* at 70.

**2.** The Seaboard is the dominant railroad in the southeast United States serving most of the corn feed markets in this region.

Code Cong. & Ad.News 3978, 4148–49; S.Rep. No. 96–470 96th Cong., 1st Sess. 42 (1979). Subsection (c) also provides that the Commission may require the parties to enter into a switching agreement if it is "necessary to provide competitive rail service." The legislative history of subsection (c) reveals that Congress sought, in part, to encourage increased competition between railroads. S.Rep. No. 470 96th Cong., 1st Sess. 41 (1979); H.R.Rep. No. 1035 96th Cong., 2d Sess. 67 (1980). Thus, in enacting subsection (c), Congress attempted to increase competition "[i]n areas where reciprocal switching is feasible ..." and where the switching agreement would provide "an avenue of relief for shippers where only one railroad provides service and it's inadequate." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 116–17, *reprinted in* 1980 *U.S.Code Cong. & Ad.News* 4148–49; S.Rep. No. 470, 96th Cong., 1st Sess. 42 (1979).

### C. *Administrative Proceedings*

Subsequent to the filing of Central's complaint requesting a joint use or reciprocal switching agreement, Central and Seaboard filed briefs and affidavits with the Commission supporting their respective positions. Central argued that if it were allowed to ship directly from its Fort Wayne grain elevator to its grain elevator in Camilla, Georgia, it could save approximately $948 in shipping charges per three car unit.[3] In response, Seaboard noted that this rate differential failed to provide for any switching charges for use of its tracks and, thus, the potential saving to Central was overstated. Seaboard submitted evidence that it was able to ship grain to Central's elevator in Camilla, Georgia from other locations in the general geographic area of Fort Wayne, Indiana, such as Synthiana, Mount Vernon, Oaktown, Sullivan and Banbridge, Indiana and Cincinnati,

Ohio, at rates equal to or less than Southern's rates from Fort Wayne, Indiana to Camilla, Georgia. Further, according to Seaboard, Central's elevator in fact is not located within the Camilla, Georgia switching district, but rather is located at a local station named Woodacre, and Seaboard's policy is not to enter into switching agreements with other railroads outside the switching district.[4] Finally, relying on *Jamestown, N.Y., Chamber of Commerce, et al. v. Jamestown, Westfield & N.W.R.R.*, 195 I.C.C. 289 (1933), Seaboard contended that in order for a switching agreement to be in the public interest the petitioner must have demonstrated, "more than a mere desire on the part of [the] shipper" and that before "something substantial is to be taken away from a carrier for the sole benefit of such parties, actual necessity or some compelling reason must first be shown before ... such action [is found to be] in the public interest." *Id.* at 292.

After reviewing the supporting briefs and affidavits, the Administrative Law Judge ("ALJ") dismissed Central's complaint, noting:

"The Judge is inclined to agree with Seaboard that it is providing adequate service to Sowega's facility and that opening this facility to reciprocal switching would not be in the public interest since line-haul revenues would be transferred from Seaboard to Southern; and that what complainant really wants is to ship grain from one of its facilities to a second of its facilities providing in essence a substitution of line-haul carriers which 'certainly would not foster any sort of competitive situation.' ... While complainant states that Seaboard's service is not adequate when compared to the reciprocal switching available to its Camilla competitors, the Judge is not convinced

---

**3.** Although the record is not entirely clear on this point, this amount apparently represents the difference between Southern's single-line rate and its joint rate for transporting corn from Fort Wayne, Indiana to Camilla, Georgia. A joint rate includes an additional charge when one railroad travels over another railroad's

tracks. This joint rate would apply if Seaboard were to move the grain from Fort Wayne to Camilla over the Southern railroads tracks.

**4.** As will be discussed later in this opinion, the parties dispute whether Woodacre is a part of the Camilla, Georgia "switching" district.

that defendant's service is inadequate...."

Central appealed the ALJ's decision to the Commission's Review Board ("Board"). On April 20, 1983, the Board reversed the ALJ's initial decision and ordered Southern and Seaboard Railroads to enter into a switching agreement to provide service over the 1.4 miles of Seaboard track between the Southern and Seaboard tracks intersection and Central's grain elevator.

Seaboard appealed the Board's decision to the entire Commission which reversed the Board's order with Chairman Tailor, dissenting. The Commission initially described the permissive nature of the authority granted by Congress under 49 U.S.C. § 11103(c)(1) ("the Commission *may* require rail carriers" to enter into switching agreements), and concluded that this language enabled the Commission to consider the totality of the circumstances in these proceedings rather than requiring that it mechanically apply the statutory tests set forth in § 11103(c)(1). The Commission then considered whether the requested relief met either of the two required tests for a reciprocal switching order: (1) that the switching agreement is practical and in the public interest; or (2) that it is necessary to provide competitive rail service. *See* 49 U.S.C. § 11103(c)(1) (1985). The Commission found that neither test had been satisfied. According to the Commission, Central failed to satisfy the practicability test because a common station or terminal area is a prerequisite for switching, and Woodacre, the alleged location of Central's grain elevator, is not within the Camilla terminal limits. Since Central's grain elevator is not located at a common station or within a jointly-served terminal in the Camilla area, the Commission concluded that "this was not a reciprocal switching situation."

The Commission also found that the switching agreement was not in the public interest. Specifically, the Commission noted that the "interest of a single shipper is not necessarily synonymous with the public interest" and further held that the Review Board failed to adequately consider Seaboard's interest when attempting to strike a balance between the carriers', the shippers' and public's interest in the switching agreement. The Commission delineated four reasons why the agreement was not in the public interest. First, the Commission concluded that the Board failed to consider Seaboard's history of inadequate revenues and noted that "[t]he loss of even minimal revenues can only serve to exacerbate this situation." Second, the Commission stated that "it is difficult to reconcile the Board's conclusions on this point [ordering the switching agreement] with a primary legislative design of the Staggers Act of increasing carrier freedom and reducing the Commission's role in regulating the rail industry." Third, the Commission observed that the Board's decision would also frustrate Seaboard's "efforts to secure improved earnings over specific routes pursuant to 49 U.S.C. 10705 and 10705(a)." Fourth, citing *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 367 I.C.C. 718, 720 (1983), the Commission determined that to find a reciprocal switching agreement to be in the public interest, the Commission would have to find that there was some actual necessity or compelling reason for the agreement. The Commission concluded that there was no compelling reason for the agreement, rather Central merely desired "something convenient" for its business.

The Commission next considered whether the switching agreement was "necessary to provide competitive rail service," the second test under section 11103(c). The Commission held that "granting the proposed forced reciprocal switching will not enhance intramodal rate competition between Southern and Seaboard" since Central is primarily concerned with the grain movements from Fort Wayne to Camilla and Southern is able to handle this traffic without the proposed switching agreement. The Commission noted that since Seaboard cancelled the joint route between Fort Wayne and Camilla, Southern had been transporting Central's grain to Camilla and shipping it across town via trucks. The Commission stated, "the advantages to

complainant of securing grain from its own Fort Wayne elevator ... apparently outweighs switching to alternative sources permitting inbound routing via [Seaboard] at lower transportation costs. Factors other than transportation considerations appear to be controlling here." The Commission thus concluded that Central sought reciprocal switching only to eliminate the existing trucking movements at Camilla on the Fort Wayne traffic "and not as a means of obtaining alternative, competitive rail services to those of SBD [Seaboard]."

Finally, the Commission concluded that Central had "not made out a compelling public need for" joint terminal service pursuant to section 11103(a). Accordingly, the Commission reversed the Review Board's decision and dismissed Central's complaint.

Central argues on appeal that the Commission improperly extended the statutory time limit, imposed by section 10327, to review the Board's decision and the Commission was thus without jurisdiction to overturn the Board's decision. Central also argues that the Commission improperly relied on findings not based on the record of the proceedings and misapplied the statutory standards set forth in section 11103(c). Finally, Central asserts that the Commission failed to state in sufficient detail the reasons for its denial of Central's request for joint terminal services.

## II

Initially, we turn to Central's contention that the Commission was without authority to overturn the Board's decision since it failed to render its decision within the time limits provided in 49 U.S.C. § 10327 governing the disposition of direct appeals from an ALJ's decision filed with the Commission. Section 10327 determines when the Commission may decide an appeal from a previous agency decision. Subsection (f)(2) provides, in part:

"An *initial decision* may be reviewed on the record on which it is based or by a further hearing. If an *initial decision* is reviewed, it shall be stayed pending final determination of the matter.... If an appeal is filed under subsection (e)(1) of this section, the final determination shall be made by the *180th day after the appeal is filed.*"

49 U.S.C. § 10327(f)(2) (emphasis added). Section 10327(j) provides that the Commission may extend the 180-day time period "for a period of not more than ninety days.... If a majority of the Commissioners agreed to it by *public vote.*" 49 U.S.C. § 10327(j) (emphasis added). Sections 10327(g)(1) and (2) govern discretionary appeals filed with the Commission from agency decisions other than the initial decision. Section 10327(g)(1) contains no time limit for review of an earlier Commission action and states that the Commission may change a decision "at any time on its own initiative because of material error, new evidence, or substantially changed circumstances ..." Section 10327(g)(2) states that:

"The Commission may grant a rehearing, reargument, or reconsideration of an action of the Commission that was taken *by a division* designated by the Commission if it finds that—(A) the action involves a matter of general transportation importance.... The Commission shall complete reconsideration and take final action by the 120th day after the petition is granted." [5]

49 U.S.C. § 10327(g)(2) (emphasis added). The significant difference between Sections 10327(g)(1) and (g)(2) is that subsection (g)(2) contains a 120-day time limit for review of a decision of a *division* of the Commission while subsection (g)(1) contains no time limitation for review.

The Board [6] reversed the ALJ's decision on July 6, 1983 and on August 19,

---

**5.** A division is composed of a panel of Commissioners selected by the Commission to hear the case. *See* 49 U.S.C. § 10302.

**6.** The Review Board is comprised of three Commission employees to whom the responsibility

to decide appeals from initial decisions is delegated pursuant to 49 U.S.C. § 10305(a). Any action taken by the Review Board "has the same force and is taken in the same manner as if

1984, Seaboard filed an appeal requesting the Commission review the Board's decision. The Commission, believing that the 180-day time limit in section 10327(f) controlled the timing of the appeal, entered an order on March 15, 1984, pursuant to section 10327(j), granting itself an additional ninety days from the expiration of the 180-day time period to decide the merits of the appeal. Central contends that this extension of time was improperly granted as the Commission failed to take a "public vote" prior to granting itself the extension of time as required by § 10327(j), but instead approved the order extending the time limit by a "notation" vote circulated among the Commissioners.[7] Seaboard's appeal to the Commission was from the Board's decision and not from the *initial* decision of the ALJ and our review of the statute's language reveals that section 10327(f) governs only appeals from an initial decision. The record discloses that while the Commission may initially have been mistaken that it was reviewing an initial decision under § 10327(f)(2) when it issued an order extending the time period for rendering its decision, the Commission corrected its mistake in its May 15, 1984 order when the Commission stated its basis for review of the Board's decision was that the appeal concerned "matters of general transportation importance." Decisions involving "matters of general transportation impor-

tance" are grounds for discretionary review under subsection (g)(2); subsection (g)(2), however, applies only to a review of a division decision.[8] In this case, the record is clear that Commission reviewed the decision of the Board and not the decision of a division of the Commission. Therefore, the power of the Commission to hear the appeal was not premised on subsection (g)(2) since this subsection governs only a review of a decision of the division of the Commission. Our examination of the record, however, convinces us that the Commission properly exercised its power to hear the appeal pursuant to subsection (g)(1). As previously noted, subsection (g)(1) contains no time limit when the Commission reviews a decision for "material error, new evidence, or substantially changed circumstances...." Throughout its decision, the Commission takes issue with the Board's application of the statute governing the switching agreement, section 11103(c), to the facts of the case. The Commission states that the "proceeding does not involve an ordinary request for reciprocal switching ...," and that "[t]he Board did not adequately weigh the interests of [Seaboard] in balancing the public interest equation...." The Commission further noted that the Board's decision "is difficult to reconcile ... [with] the primary legislative design of the Staggers Act of increasing carrier freedoms and reducing

taken by the Commission." 49 U.S.C. § 10305(c).

**7.** By the term "notation" vote, Central apparently refers to the process of voting by using an internal memorandum to record the votes of the Commissioners.

**8.** Our review of the record reveals that at the time the Commission decided to grant this appeal, only four of the seven positions on the Commission were filled. Thus, the Commission apparently decided to hear the appeal cases rather than appoint a division of the Commission, consisting of three Commissioners to decide the appeal.

If the Board could be considered the functional equivalent of a division, since there was a shortage of Commissions to serve as a division of the Commission at the time of this appeal, then the Commission's review of the Board's decision would be governed by subsection (g)(2) which provides that the Commission must de-

cide the appeal within 120 days. The Commission, pursuant to § 10327(j), may extend this period for 90 days. In this case, the Commission took longer than the 210 days (120 + 90) required by the statute to decide the appeal. We do not have to decide whether this failure to timely decide the case stripped the Commission of jurisdiction to act since we hold that the Commission had the power to decide this case pursuant to § 10327(g)(1). We do note, however, that an administrative agency's failure to act timely does not necessarily strip it of jurisdiction to act where the underlying jurisdictional statutes (in this case, section 10327) fails to set forth a sanction for failure to comply with the statute's time table. *Dana Corp. v. I.C.C.,* 703 F.2d 1297, 1300 (D.C.Cir.1983). *See St. Regis Tribe, New York v. Brock,* 769 F.2d 37, 41 (2d Cir.1985); *Thomas v. Barry,* 729 F.2d 1469, 1470 n. 5 (D.C.Cir.1984).

the Commission's role in regulating the rail industry." As the quoted passages from the Commission's decision demonstrate, the Commission was clearly concerned that the Board had not properly applied the public interest test set forth in section 11103(c) in assessing the propriety of the reciprocal switching agreement. This, in our view, constitutes "material error" under subsection (g)(1) as the Commission clearly expressed its view that the Board had misapplied and misinterpreted section 11103(c).[9] Thus, subsection (g)(1) provides the Commission with the discretionary authority to review the Board's decision and this section contains no time limit for the Commission's review. The Commission, however, stated that its reason for granting the review was that the Board's decision concerned "matters of general transportation importance." We may hold that the Commission's failure to clearly articulate the grounds for granting the appeal may be considered harmless error if we are convinced that the Commission would have reached the same result absent the error. *See Illinois v. Interstate Commerce Commission,* 722 F.2d 1341, 1348–49 (7th Cir.1983); *Bethlehem Steel Corp. v. Gorsuch,* 742 F.2d 1028, 1036 (7th Cir.1984). In this case, we are convinced that the Commission would have granted the appeal not only because of "general transportation importance" but also because of the Board's material error in its application of section 11103(c). Thus a remand of this case to the Commission to clarify and amplify the grounds for its decision in taking this appeal is not warranted. Since we hold that the Commission's failure to identify the grounds upon which it granted the appeal under section 10327(g)(1) was harmless error, we address the standard of review that we shall follow in assessing the merits of this case.

## III

### A. *Standard of Review*

■ Before addressing the merits of Central's appeal, we set forth the applicable standard for review of the Commission's decision. The parties disagree on the proper standard of review to be applied to the Commission's actions in this case. Central contends that we must review the Commission's decision pursuant to both the arbitrary and capricious standard of review, codified in 5 U.S.C. § 706(2)(A), and the substantial evidence standard of review, detailed at 5 U.S.C. § 706(2)(E). The Commission, however, contends that the arbitrary and capricious standard of review is the only proper standard in this case. The arbitrary and capricious standard of review applies to the review of all agency decisions. *Illinois v. United States,* 666 F.2d 1066, 1071 (7th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982) (noting that the arbitrary and capricious standard "applies to all cases"). Thus, we must determine whether the substantial evidence standard of review also applies in this case.

■ Title 5 U.S.C. § 706(2)(E) provides that an agency decision is to be set aside if not supported by substantial evidence only in those cases "subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute." When a statute does not expressly require an "on the record" hearing this court has stated that the only standard of review of the agency decision is provided by 5 U.S.C. § 706(2)(A), which states that an administrative agency's action is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Illinois v. United States,* 666 F.2d at 1071; *see also United States v. An Article of Device ... Diapulse,* 768 F.2d

---

**9.** Our research disclosed that the Commission does review, pursuant to § 10327(g)(1), the decisions of subordinate panels in the agency. *Magner-O'Hara Scenic Ry. v. I.C.C.,* 692 F.2d 441, 443, 445 (6th Cir.1983) (Commission review of a division's decision pursuant to subsection (g)(1)). *See People of State of Illinois v. United*

*States,* 666 F.2d 1066, 1071 (7th Cir.1981) (Commission reopened decision of a division pursuant to subsection (g)(1) to consider new evidence); *Central Illinois Public Service Co. v. I.C.C.,* 659 F.2d 820, 822–23 (7th Cir.1981) (Review Board may reopen proceedings pursuant to § 10327(g)(1)).

826, 829–30 (7th Cir.1985); *Black v. ICC*, 737 F.2d 643, 650 (7th Cir.1984); *Simmons v. United States*, 698 F.2d 888, 894 (7th Cir.1983). In this case, the procedures the Commission is to follow in making its initial decision on the merits of a proposed action are set forth in 49 U.S.C. § 10327(b) that states: "If evidence is submitted in writing or testimony is taken at a public hearing, the initial decision shall be submitted to the Commission in writing by the 120th day after completion of all evidentiary proceedings...." The initial decision must contain the ALJ's findings of facts, a discussion of those facts, and his conclusions of law. *Id.* Because section 10327(b) requires that evidence be submitted "in writing or ... taken at a public hearing ..." it is clear that the statute requires that there be an "on the record" proceeding. *See* K. Davis, Administrative Law § 10.7 at 329 (2d ed. 1982). Thus, since the proceeding is "on the record," the substantial evidence standard of review codified in § 706(2)(E) also applies in this case.[10]

 Our review of an agency decision under the arbitrary and capricious standard is necessarily narrow. "[A] court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)); *Illinois v. United States*, 666 F.2d at 1073 (citing *Bowman Transp. v. Arkansas-Best Freight System*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974)). As we stated in *Illinois v. United States*, the "primary requirement of the 'arbitrary and capricious' standard of review is the 'simple but fundamental rule of law' that an 'agency must set forth clearly the grounds on which it acted.'" 666 F.2d at 1073 (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973)). Under the substantial evidence standard of review, we must examine the evidence before the Commission and determine if the record contains the quantum of proof required to support the Commission's decision. With these standards of review in mind, we address the merits of this case.

## B. *Reciprocal Switching Agreement*

As previously noted, under section 11103(c)(1) the Commission has the authority to order a reciprocal switching agreement if the Commission finds the agreement to be "practicable *and* in the public interest" or where the agreement "is necessary to provide competitive rail service." Central challenges the Commission's determination that Central's grain elevator was not within the Camilla, Georgia switching district and thus its finding that the proposed switching agreement did not meet the "practicable" test under § 11103(c). Central also argues that the Commission misapplied the "public interest" test set forth in section 11103 as the Commission improperly weighed Seaboard's revenue inadequacy against Central's need for the switching agreement and applied an incorrect definition of what constitutes the "public interest." Finally, Central contends that the Commission, based upon the evidence before it, reached the incorrect conclusion that the switching agreement was not "necessary to provide competitive rail service," as required by section 11103(c). Since the alleged improper findings would have affected the Commission's

---

10. As we noted in *Illinois v. United States*, the difference between the arbitrary and capricious standard of review and the substantial evidence standard of review is primarily a semantic distinction since an action that is not "arbitrary, capricious, an abuse of discretion or not in accord with the law" must necessarily be supported by the evidence in the record. *Illinois v. United States*, 666 F.2d at 1072, n. 6 (citing *Doe v. Hampton*, 566 F.2d 265, 271–72 n. 15 (D.C.Cir. 1977). *See also Black*, 737 F.2d at 650. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

analysis of the tests specified in section 11103(c), we address the Commission's application of those tests to the facts of this case.

Under one of the tests set forth in section 11103(c), the Commission may order a reciprocal switching agreement when it determines that it is not only "practicable" but also "in the public interest." In this case, the Commission found that the proposed switching agreement was neither practicable nor in the public interest. In reaching its conclusion that the switching agreement would not be practicable, the Commission stated that "this proceeding does not involve an ordinary request for reciprocal switching . : ." since Central's grain elevator is located at "Woodacre," Georgia and is not within the switching terminal limits of Camilla, Georgia. The Commission added:

"Reciprocal switching occurs at stations or terminals served by more than one carrier. A common station or terminal area is, therefore, a prerequisite for such switching. Since complainant is not located at a common station or within a jointly served terminal, this is not a reciprocal switching situation. Unlike *Delaware & H.Ry. Co. v. Consolidated Rail Corp.*, 367 I.C.C. 718 (1983) (*Delaware & Hudson*), which involved a distribution over reciprocal switching arrangements within an existing terminal, Philadelphia, this case involves an attempt to extend reciprocal switching arrangements at a common station, Camilla, to a local station *outside* the existing switching limits of that station."

Central disagrees with the Commission's finding that Central's elevator is located at "Woodacre," Georgia and with the Commission's characterization of "Woodacre" as separate from the Camilla station or terminal area. According to Central, the official city map of Camilla, Georgia shows Central's grain elevator located within the

city limits of Camilla and Central contends that since it is within the Camilla city limits, it is within the switching or terminal area of Camilla. Thus Central contends that this case is similar to the ICC's decision in *Delaware v. Hudson* which held that the practicality test had been satisfied.

The Commission traditionally has defined the terminal or switching area as the location of the tariff or billing station of a Seaboard railroad. The tariff station is considered the point of shipment listed on the railroad's bill of lading. *See Switching Charges and Absorption Thereof at Shreveport, La.*, 339 I.C.C. 65, 70 (1971). Here, Seaboard's tariff or point of billing is Woodacre, Georgia, as listed on the bills it submits to shippers for payment for goods shipped from this area.[11] Thus, although Central's grain elevator was within the city limits of Camilla the Commission determined that it was not within the terminal area of Camilla, Georgia. Consequently, the Commission concluded that the situation did not involve "an ordinary request" for a reciprocal switching agreement.

In *Delaware & Hudson*, however, the Commission set forth a four part test to assess whether or not a switching agreement is "practicable." *Delaware & Hudson*, 367 I.C.C. at 720–21. The Commission did not apply this four part test in reaching its decision that the switching agreement was not "practicable" since the Commission distinguished its *Delaware & Hudson* decision from the facts of this case. The Commission's attempt to distinguish this case from the *Delaware & Hudson* case on the basis that the switching agreement in *Delaware & Hudson* concerned tracks within the Philadelphia switching district while the switching agreement in this case concerned tracks outside the Woodacre switching district, however, is not entirely convincing. In *Delaware & Hudson*, the Commission ordered the Conrail Railroad, which

---

11. Prior to 1975, Central's grain elevator was located outside the city limits of Camilla, Georgia. A collection of businesses were located in this area, next to the Seaboard tracks. Seaboard called the site Woodacre on its bill of lading. Seaboard has continued to label the point of origin for its shipments from this site as "Woodacre," even though the site is now within the city limits of Camilla, Georgia.

at the time controlled all rail lines within Philadelphia, to enter into reciprocal switching agreements with the Delaware & Hudson Railroad covering the greater Philadelphia area. In the instant case, Central's grain elevator that is served by Seaboard is located within the city limits of Camilla, Georgia. This is factually similar to the *Delaware & Hudson* case, where the businesses that benefited from the switching agreement were located within the greater Philadelphia area. But whether or not the Commission correctly found the switching agreement was not "practicable" does not determine whether or not the Commission's decision was arbitrary and capricious or not supported by substantial evidence since, pursuant to section 11103, Central must demonstrate that the requested reciprocal switching agreement is both "practicable" and in the "public interest."

■■■■ Central contests the Commission's finding that the reciprocal switching agreement was not in the public interest. To support this assertion, Central argues that the Commission improperly relied on Seaboard's inadequate revenues as a factor despite Seaboard's failure to present evidence supporting this contention. Further, Central contends that the Commission failed to weigh the interests of the shipper, Central States, against the alleged revenue inadequacy of the carrier, Seaboard. The Commission derived its information concerning Seaboard's inadequate revenues from a Commission study reported in *Railroad Revenue Adequacy—1980 Determinations*, 365 I.C.C. 285 (1981).[12] The consideration of this information, as part of the Commission's decisionmaking process, is entirely proper as an administrative agency may include its own factual and

background materials concerning one of the parties in the action in the administrative record even though not submitted by one of the parties. *See* 1 K. Davis, Administrative Law § 6:5, at 461–62 (2d ed. 1978).

■■■■ Further, contrary to Central's contention that the Commission failed to balance the needs of Seaboard for greater revenues against Central's need for the reciprocal switching agreement, our review of the record discloses that the Commission did in fact weigh the interests of Seaboard and Central. Specifically, in criticizing the Board's decision to order a reciprocal switching agreement, the Commission stated that "[t]he Board did not adequately weigh the interests of [Seaboard] in balancing the public interest equation" and that "[Seaboard] can transport to complainant's grain elevator ... grain from many origins for less than [Southern's] rates from Fort Wayne, IN."[13] The Commission therefore concluded that Central had merely demonstrated a desire "for something convenient" for its business. The Commission did recognize that the interests of the carrier and shipper must be weighed, but determined that the Board had failed to adequately consider Seaboard's revenue inadequacy in reaching its conclusion that Seaboard should be forced to accept the reciprocal switching agreement. The Commission's concern with Seaboard's potential loss of revenues from a reciprocal switching agreement was certainly justified. Central planned to rely exclusively on Southern Railroad, if the Commission approved the reciprocal switching agreement, for all inbound shipments of corn to its grain elevator in Camilla, Georgia from its grain elevator in Fort Wayne, Indiana.[14]

12. The study was conducted pursuant to the statutory directive contained in 49 U.S.C. § 10704(a).

13. The record discloses that Seaboard was able to ship to Central's grain elevator from origins located in the corn belt at competitive rates, and even sometimes lower rates, than the rates offered by Southern from Fort Wayne to Camilla.

14. Although Central on appeal now disclaims that its sole interest in this case was to simply

obtain a switching agreement between Southern and Seaboard at the intersection of their tracks outside of Camilla for the route between Fort Wayne and its grain elevator in Camilla, the administrative record discloses that this has been the precise issue throughout the entire proceedings in this case. For example, Central admitted in its administrative appeal to the Review Board that "the fact is, the Initial Decision is correct in stating that 'what complainant really wants is to ship grain from one of its facilities

Central's exclusive reliance on Southern for all inbound shipments to Camilla would of course affect Seaboard's potential future revenues since Seaboard, no matter how competitive the price of its long-haul shipping rates, would effectively be barred from transporting the inbound shipments of corn to Central's Camilla grain elevator. Thus, the Commission, charged with supervising the overland interstate transportation industry in the United States, acted within its discretion in assessing what was in the public's interest when it considered Seaboard's revenue inadequacy and the effect of the proposed switching agreement on Seaboard's ability to compete for grain shipments.[15] Moreover, given the evidence in the record that Central wished to ship its corn directly from Fort Wayne to Camilla, the Commission logically concluded that Central merely sought the switching agreement as "something convenient to it."[16]

Central next contends that the standard employed by the Commission in assessing whether Central's request for a switching agreement is in the "public interest" is inconsistent with the standard the Commis-

sion previously employed prior to the passage of the Staggers Act in 1980 enacting § 11103(c). In denying Central's request for the switching agreement, the Commission cited the most recent switching agreement case, the *Delaware & Hudson v. Consolidated Rail Corp.*, for the proposition that "the interest of a single shipper is not necessarily synonymous with the public interest ..." and "[t]o find ... a reciprocal switching agreement is in the public interest we would have to find that there is 'some actual necessity or compelling reason' for it." When Congress enacted section 11103(c), the Conference adopted that portion of the Senate bill which provided that the practicable and public interest standard to be considered by the Commission "... is [to be] the same standard the Commission has applied in considering whether to order the joint use of terminal facilities." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 116–17, *reprinted in* 1980 *U.S. Code Cong. & Ad.News*, 3978, 4148–49. Central contends that the standard the Commission previously applied when evaluating whether a joint use of terminal facili-

to a second of its facilities.'" Central owns only two elevators—one in Fort Wayne and another in Camilla.

15. Central argues that Seaboard's revenues would increase because more corn could be shipped into Camilla under a reciprocal switching agreement thereby causing an increase in outbound shipments of corn on the Seaboard. However, we have been unable to discover any evidence in the record in support of this assertion. The evidence fails to disclose whether or not Central's grain elevator in Camilla was presently operating at maximum capacity. Even assuming the grain elevator was not operating at maximum capacity, the evidence does not disclose that the reason it was not at full capacity was that Central was unable to ship the desired quantities of corn to the elevator. Further, to support Central's assertion that the Seaboard's revenues would increase for outbound shipments if a reciprocal switching agreement were allowed in this case, one would have to assume that the demand for the corn in the southeast United States (the market Seaboard serves) was of such a nature that there was a constant demand for Central's corn. The record in this case, however, fails to disclose any such information that would support this contention.

16. The record fails to disclose any supporting figures and data establishing that Central's Camilla grain elevator was losing money. Although Central submitted an affidavit of Larry Shura, President of Central States, stating that Central's ability to compete is adversely affected by the existing rail service, Central failed to submit any evidence to support this assertion.

Central also argues that its two competitors located next to the Southern tracks in Camilla, Georgia did have reciprocal switching agreements with Seaboard and thus the Commission was mistaken in concluding that Central was treated the same as these two competitors. These switching agreements between Southern and Seaboard, however, concerned only outbound shipments to corn markets served exclusively by the Seaboard; there were no switching agreements between the railroads for inbound shipments to Camilla for Central's competitors' grain elevators. Thus, the Commission was not in error in concluding that Central was treated in the same fashion as its competitors. In order to demonstrate that it was being treated unequally, Central would have to submit evidence that Seaboard denied Central's request for a switching agreement for outbound shipments to markets that are served by the Southern and not the Seaboard.

ties was in the public interest was not that a "compelling reason" exist for the joint use agreement, but that "[a]ll terminal property should be thrown open to all users on fair and equal terms so that every industry on whatever rails located shall have access to all lines radiating from that terminal...." *Consolidation of Railroads*, 159 I.C.C. 522, 522 (1929). As the Commission notes in its brief, the *Consolidation of Railroads* was a Commission study of a plan to consolidate the entire United States railroad industry into a limited number of systems. Since Congress never adopted this plan, Central's quotation from the supporting ICC study fails to provide convincing and persuasive support for its interpretation of the proper "public interest" standard.[17]

To support the "compelling need" test, the Commission cited the *Delaware & Hudson* case that in turn relied on *Jamestown, N.Y., Chamber of Commerce et al. v. Jamestown, Westfield & N.W.R.R.*, 195 I.C.C. 289 (1933). In *Jamestown*, the Commission stated that "[w]here something substantial is to be taken away from a carrier for the sole benefit of such parties, and with no corresponding benefit to the carrier, ... we are inclined to view that some actual necessity or some compelling reason must first be shown before we can find such action in the public interest." *Id.*, 195 I.C.C. at 293; *see also Lehigh Valley R.R. Co. Trackage Rights*, 312 I.C.C. 389 (1961) (noting that the needs of the carriers must also be considered in determining the propriety of ordering a joint use of rail facilities); *Mfrs. Ass'n. of York, Pa. v. Penn. R.R. Co.*, 73 I.C.C. 40

(1922) (needs of carriers must be considered); *Hastings Commercial Club v. Chicago, Milwaukee & St. Paul Ry. Co.*, 107 I.C.C. 208 (1926) (carrier must receive just compensation). These pre-Staggers Act cases are all joint use cases that describe the public interest standard in terms similar to those used in cases decided since the passage of the Staggers Act in 1980. *See, e.g., Delaware & Hudson v. Consolidated Ry. Corp.*, 367 I.C.C. 718 (1983). Thus, the Commission has applied the "same standard [it] ... has applied in considering whether to order the joint use of terminal facilities." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 116–17, *reprinted in* 1980 *U.S.Code Cong. & Ad.News*, 3987, 4148–49.[18]

Central next argues that it satisfied the alternative, independent test requiring that the reciprocal switching agreement be "necessary to provide competitive rail service" between Southern and Seaboard railroads. Specifically, Central notes that in the past the Commission has favored competition between the railroads in order to gain increased efficiency and better service. *See Delaware & Hudson*, 367 I.C.C. at 723 (stating that competition is a public benefit endorsed by Congress when it passed the Staggers Act). *See also Western Railroads—Agreement*, 364 I.C.C. 1, 5 (1980).

In this case, the Commission examined the evidence before it and observed that: "A forced reciprocal switching agreement is not necessary here, since a competitive rail service already exists. Complainant can ship its grain from many

---

17. The cases cited by Central as following the standards set forth in the *Consolidation* report do not involve joint use of the terminal facilities. *See Illinois Central Railroad Company, Construction*, 307 I.C.C. 493, 529 (1959) (involving the construction and acquisition of railroad tracks); *Minneapolis Traffic Association v. Chicago & North Western Railroad Company*, 241 I.C.C. 207, 219 (1940) (involving the propriety of switching charges); *Atchison, Topeka & Santa Fe Railway Company Construction*, 261 I.C.C. 227, 236 (1945) (involving construction of an extension of a rail line).

18. Further, it is axiomatic that a reviewing court must afford a considerable deference to a federal agency's interpretation of its own precedent, unless the interpretation is clearly erroneous. *See Seaboard Coast Line R.R. Co. v. United States*, 599 F.2d 650, 652 (5th Cir.1979) (citing *Andrew Nelson, Inc. v. United States*, 355 U.S. 554, 558, 78 S.Ct. 496, 498, 2 L.Ed.2d 484 (1958)). As the discussion in the text demonstrates, the Commission's interpretation of its own precedent defining public interest as requiring a compelling need certainly was not clearly erroneous as the cases the Commission cited clearly support its interpretation.

points in the Midwest and Southwest at lower rates than presently exist via Southern."

 Thus, the Commission concluded that:

"Granting the proposed forced reciprocal switching will not enhance intramodal rate competitive between SOU and SBD. The complainant is primarily concerned with grain movements from its elevator at New Haven (Fort Wayne) and reciprocal switching would be limited to traffic from that origin. Even without reciprocal switching, however, SOU is handling this traffic.... This has been the case even though the grain must be trucked across to complainant's facility on arrival at Camilla.... Factors other than transportation considerations appear to be controlling here."

Simply put, the Commission found from the present record that the desire to increase competition (and thus decrease the price of rail service) was not a factor in Central's decision to request the Commission to order a switching agreement. Seaboard submitted as evidence of the fact that competition was not a factor, a list of ten locations, five within the same geographical region as Central's grain elevator in Fort Wayne, Indiana, from where Seaboard could ship corn to Central's grain elevator in Camilla at a competitive or lower rate than Southern's rate from Fort Wayne, Indiana. The reason Central desires to ship corn directly from its Fort Wayne facility to Camilla is that it is more expensive to ship corn to Camilla from the grain elevators located next to the Seaboard's tracks than from Central's grain elevator in Fort Wayne located next to the Southern's tracks, with the last 1.4 miles of this journey to be completed by truck. The added expense, as we read the record, was caused by the increased cost of purchasing corn from other corn elevators located next to the Seaboard's tracks and not the cost of transporting corn from the other locations in the corn belt. Thus, the Commission reached the logical conclusion that "factors other than transportation considerations appear to be controlling ..." Further, the record also supports the Commission's conclusion that there was no desire on the part of Central to seek competitive rates since the rates offered by Seaboard were already competitive. In this case, Central simply desires a direct route from its grain elevator in Fort Wayne to its grain elevator in Camilla; thus, the Commission was justified in reaching its conclusion that no competitive purpose would be served by ordering a reciprocal switching agreement. Based upon the evidence submitted, the Commission reached the proper conclusion that the switching agreement was "not necessary for competition" between the railroads since no competitive purpose would be served in ordering the switching agreement.[19]

 Prior to the passage of the Staggers Act, railroads often refrained from entering into reciprocal switching agreements. *See* S.Rep. No. 470, 96th Cong., 1st Sess. 41 (1979). The purpose of the Staggers Act was to encourage, under the appropriate circumstances, but not require, the Commission to approve railroad switching agreements. The dissent pursuant to its proposed "prima facie" burden of proof analysis (see dissent at 1), however, apparently would require that the ICC approve all proposed switching agreements where it would increase the access of ship-

---

**19.** The goal of the Staggers Act is to create competition between railroads (*see, e.g.,* H.R. Rep. No. 96–1035, 96th Cong.2d Sess. 67 (1980); S.Rep. 470, 96th Cong. 1st Sess. 41 (1979)) in those areas where reciprocal switching is "feasible" and where only one railroad "provides services and it is inadequate." H.R.Conf.Rep. 96–1430, 96th Cong., 2d Sess. 116 (1980), U.S.Code Cong. & Admin.News 1980, p. 4148. As pointed out, the record in this case demonstrates that competition between railroads is not a factor since Seaboard can ship corn to Camilla from other Indiana elevators at the same or lower rates than Southern can ship corn from Fort Wayne. Thus, Central's intent in requesting the switching agreement is not to foster competition, but to have a direct shipping route from Fort Wayne to Camilla. Further, Seaboard's service cannot be considered inadequate since it is willing to serve Central by delivering corn from its Indiana locations at competitive rates.

pers to railroad facilities. Relying on the "prima facie" burden of proof analysis, the dissent states: "To grant either of Central's requests would increase railroad access to Central's terminal from one railroad to two. As noted, *prima facie* at least, this amounts to an increase in competition and there is a burden on the Commission and on the Seaboard to show why the public interest would not thereby be served." The dissent's proposed *prima facie* shifting burden of proof analysis is not supported by the facts of this case. The entire assumption throughout the proceedings before the Commission was that Central desired a switching agreement in order to ship corn directly from its elevator in Fort Wayne to its elevator in Camilla. The Commission found, and its finding is supported by evidence in this record, that Central did not seek this switching agreement in order to increase competition between Southern and Seaboard railroads as Seaboard was ready, willing and able to ship corn to Central's grain elevator at competitive rates. Thus, the dissent's assumption that the switching agreement will provide access for two railroads to Central's grain elevator, thus fostering competition, is contrary to the Commission's well supported finding that access will not aid competition. Even assuming that under the facts of this case competition will be increased by forcing a switching agreement upon Seaboard, the dissent's analysis in shifting the burden to the Commission "to show why the public interest would not thereby be served" is not supported by the Staggers Act legislative history. As noted throughout this opinion, Congress stated that in assessing the need for a proposed switching agreement, the Commission is to apply the "same standard [it] ... has applied in considering whether to order the joint use of terminal facilities." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 116–17, *reprinted in* 1980 U.S.Code & Ad.News 3987, 4148–49. As the Commission noted, the standard employed in reviewing whether a joint use agreement is in the public interest is that "there is 'some actual necessity or compelling reason' for it." The dissent's shifting burden of proof *prima facie* analysis is contrary to the Commission's legislative mandated standard of review and finds no express support in the Staggers Act legislation.

IV

Central also requested that the Commission order the Seaboard to enter into an agreement with the Southern for the joint use of Seaboard's tracks in Camilla, pursuant to § 11103(a). The Commission denied this request stating that the '[c]omplainant has also petitioned for a joint terminal service, but has not made out a compelling public need for it. Its request is denied. *Delaware & Hudson, supra."* Central contends that the Commission acted arbitrarily and capriciously in issuing this laconic statement denying Central's request for a joint use agreement since the Commission failed to articulate or explain the basis for its finding. Both § 11103(a) (governing joint use agreements) and § 11103(c) (governing reciprocal switching agreements), however, require that before the Commission may order a joint use or reciprocal switching agreement, the agreement be both "practicable and in the public interest." As previously discussed, Congress intended that the Commission apply the same "practicable and in the public interest" standard governing reciprocal switching agreements under § 11103(c) as the Commission had previously applied for requests for joint use of terminal facilities under § 11103(a). H.R.Rep. No. 1430 at 116–17 *reprinted in* 1980 *U.S.Code Cong. & Ad.News* at 4148–49. The Commission explained that one of the reasons it denied Central's request for a reciprocal switching agreement under § 11103(c) was that the agreement was not in the public interest. Thus, under these circumstances, the Commission's statement that Central's request for a joint use agreement would not be in the public interest satisfied its obligation to explain its denial of the proposed joint use agreement.

Central's request for review of the Commission's decision is denied.

CUDAHY, Circuit Judge, dissenting:

I agree that the Commission has considerable discretion to grant or deny reciprocal switching arrangements or joint use agreements. But it cannot do so without close attention to the competitive effects of its decision and a plausible explanation why competition will be advanced (or at least not suppressed) through its resolution of the problem before it. The cause of deregulation, which the Staggers Act seeks to further, is based fundamentally on the premise that competition · and the market forces which it unleashes can bring about adequate service at reasonable rates better than excessive reliance on direct regulation.[1] *See* Conference Committee Report on the Staggers Act, H.R.Rep. No. 1430, 96th Cong., 2d Sess. 80 (1980). I think *any* denial of reciprocal switching, where the operational facts make it feasible, is *prima facie* anti-competitive and requires a better justification than the Commission has furnished here.

> "[A]dditional rail competition is a clear public benefit ... one which is endorsed by rail transportation policy announced in the Staggers Act. Under the Staggers Act, competition is normally presumed to be in the public interest, and the proponent bears a light burden on this issue."

*Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 367 I.C.C. 718, 723 (1983). See also H.R.Rep. No. 1035, 96th Cong., 2d Sess. 67 (1980) ("[R]eciprocal switching has been limited· [in the past] to situations where competition between rail carriers is not threatened. The Committee intends for the Commission to permit and encourage reciprocal switching as a way to encourage greater competition."); S.Rep. No. 470, 96th Cong., 1st Sess. 41 (1979) ("As the Government moves toward significantly less regulation of the services of-

fered by railroads, the Government should encourage, rather than discourage, competition among railroads.").

The physical and operational facts here are simple. Central ships grain from its elevator in Fort Wayne, Indiana to its elevator in Camilla, Georgia on the Southern. The Southern tracks do not directly serve the Camilla elevator. But the Seaboard, which does serve the Camilla elevator, connects with the Southern only 1.3 miles from the elevator. This 1.3 miles of Seaboard track may be regarded therefore as analogous to a "bottleneck" or an "essential facility" which controls rail access to the Central elevator and in this case serves to deny access there to the Southern. *See United States v. Terminal Railroad Association,* 224 U.S. 383, 410–11, 32 S.Ct. 507, 515–16, 56 L.Ed. 810 (1912); *MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1132–33 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (setting forth standards of essential facility doctrine).[2] As a result of the Seaboard's ownership of the connecting track, Central States must resort to truck transportation to complete the carriage to its elevator, thereby presumably adding to the delivered cost of the grain. Central sought before the Commission to either (1) require the Seaboard to complete the carriage from the Southern-Seaboard junction to the Central elevator (reciprocal switching) or (2) allow the Southern to use the Seaboard tracks to deliver the grain to the Central elevator (joint use of terminal facilities).

To grant either of Central's requests would increase railroad access to Central's elevator from one railroad to two. As noted, *prima facie* at least, this amounts to an increase in competition [3] and there is a burden on the Commission and on the Seaboard to show why the public interest would not thereby be served. Certainly, I do not understand why forcing Central to

---

**1.** This dissenting opinion is not intended to express any view of the merits of "deregulation" either generally or in specific circumstances but merely to insist that this process be undertaken consistently with its own premises.

**2.** I do not suggest, of course, that the Seaboard track is necessarily an "essential facility" for antitrust purposes but the analogy seems useful for analysis of competitive impacts.

**3.** I also note that competition may be potential as well as actual.

use trucks, at an increase in cost (potentially imposed on all Central's customers), is in the public interest.

The frailty of the Commission's position is demonstrated by its reliance on the transparent fiction that Central's elevator, even though it is admittedly in Camilla, is outside the Camilla terminal, because the Seaboard calls its station there "Woodacre."

> In *geographic areas* where reciprocal switching is feasible, it provides competition to the benefit of shippers served. (House Report, Interstate and Foreign Commerce Committee No. 96–1035, May 16, 1980, page 67 (emphasis supplied)).

A "geographic area" in the contemplation of Congress was territory having political, economic and legal definition (within which presumably reciprocal switching would be operationally and economically feasible). The Commission here has permitted congressional intent to be frustrated by the Seaboard's creation of a station name for tariff purposes. Nothing in the record indicates that "Woodacre" has any reality for any purpose relevant to reciprocal switching or joint use of track. "Woodacre" is merely a device which proves handy here to fence out competition for rail traffic to certain shippers in Camilla—a city of approximately 5,500 people. By way of contrast the Chicago switching district contains 116 separate stations, the Philadelphia terminal contains 57 separate stations, the Atlanta Terminal District contains 5 stations and the Jacksonville Terminal District includes 9 separate stations. Petitioner's Brief at 14; Reply Brief at 9. Camilla's apparent two stations should not, therefore, be permitted to defeat clear congressional policy. Moreover, while the ICC claims that the existence of the separate Woodacre station makes reciprocal switching impractical, the Seaboard has a reciprocal switching arrangement with the South-

ern leading to the Escambia Treating Company—an adjacent facility to Central. *Central States Enterprises, Inc. v. Seaboard Coast Line Railroad Company*, ICC Decision No. 38891 (May 17, 1984) (Chairman Taylor, dissenting).

In addition, the Commission relied heavily on the Seaboard's "revenue inadequacy" to buttress its result. In my view, this "revenue inadequacy," is factually and legally irrelevant. Based on 1980 data, the Commission found the Seaboard revenue inadequate in 1981. Railroad Revenue Adequacy—1980 determination, 365 ICC 285 (1981). That determination found 34 of the 37 Class I railways revenue inadequate because they were earning less than a 12 per cent return on their investment. Far from finding the Seaboard teetering on the brink of bankruptcy, the ICC found that railroad to be revenue inadequate because it was only earning a 7 per cent return on its capital. Moreover, the Southern Railway Company, the company that would apparently benefit immediately from Central's proposal, was also found revenue inadequate in the same determination. Later studies by the ICC have found almost all of the Class I railways in America to be revenue inadequate. *Railroad Cost of Capital* —1982 Ex Parte No. 436 (July 22, 1983) (Petitioner's Brief at 16). It makes no sense to argue that all the railroads that fall within this broad determination of revenue inadequacy must be sheltered from competition and this is clearly not what Congress intended. *See* House Report, *supra*, at 67.[4]

In any event, the Seaboard's needs for revenue are irrelevant here because, according to the Commission's findings, if denied reciprocal switching, Central will not use the Seaboard for incoming grain shipments. Instead, it will continue to ship by the Southern and by truck (at increased cost). The only effect on the Seaboard

---

**4.** The Staggers Act reflected Congress' belief that both revenue needy railroads and the public would be better served by the invisible hand of market forces than by the visible hand of regulatory intervention. The Act therefore removed rate ceilings, expedited procedures for the abandonment of unprofitable lines and included sev-

eral provisions for furthering growth and competition. *See* Conference Committee Report, *supra*, at 80 ("A number of provisions are included to foster ·greater competition by simplifying coordination, minor merger procedures, entry and reciprocal switching agreements.").

presumably will be some loss of potential outbound shipments if reciprocal switching is *not* granted. The ultimate effect of maintenance of forced inefficiencies in the system (as by the unnecessary unloading and truck carriage here) is to reduce rail revenues in general.

I cannot believe it was the intent of Congress in the Staggers Act to protect the revenues of a particular railroad by refusing to liberate its "captive" shippers in situations where competition would otherwise be appropriate. Here the Commission apparently seeks to maintain or enhance the Seaboard's revenues by forcing unnecessary and uneconomic costs on Central. This sort of effort to protect what is called the public interest by restraining competition in the interest of particular carriers and against the interest of shippers is reminiscent of the "bad old days" before deregulation sought to unleash market forces. The Commission itself has said:

> We will not artificially and unnecessarily restrict the action of the marketplace by placing too great an emphasis on the harm to individual carriers. The preservation of corporate entities is not the same as the preservation of competition or essential service.

*Railroad Consolidation Procedures,* General Policy Statement, 363 ICC 784, 788 (1981).

In the proceeding before us, the Commission has attempted to justify its remarkable conclusions by observing that:

> The interest of a single shipper is *not* necessarily synonymous with the public interest. (Emphasis in the original)

*Central States v. Seaboard, supra,* at 3. But the Commission has missed the point that the interest of a single shipper in competition is no different in principle from the interest of a thousand shippers in competition. In neither case may the interest in competition be overlooked in favor of the interest of some carrier in potential or hoped-for revenues to be realized by keeping a shipper captive. To suppress competition is to increase costs and degrade service. Here Central and its customers are cut off from direct rail delivery of ship-ments arriving over the Southern. The need to unload and transship by truck obviously increases costs and impairs services—and to no one's benefit. These are real costs to society without offsetting benefits.

In its persuasive order in *Delaware and Hudson Ry. Co. v. Consolidated Rail Corp.,* 367 I.C.C. 718 (1983) the Commission said:

> If [a grain elevator] contends that Conrail's joint rate cancellations have effectively cut off its Port Richmond facility from any grain sources other than those on Conrail's lines D & H's [reciprocal switching] service will provide [the grain elevator] with increased sources of supply and competitive rates and services.

367 ICC, at 724.

In the case before us the Commission has contradicted the *Delaware & Hudson* decision in order to elevate the purported revenue needs of a carrier enjoying a protected position over the public interest in competition.

I would therefore remand this case to the Commission for careful reexamination in light of the paramount interest under the Staggers Act in furthering competition among carriers. I respectfully dissent.