AIR LINE PILOTS ASSOCIATION, IN-TERNATIONAL, et al., Plaintiffs,

v.

Elwood R. QUESADA, Individually and as Administrator of the Federal Aviation Agency, Defendant.

United States District Court
S. D. New York.
March 14, 1960.

Samuel J. Cohen, New York City (Cohen & Weiss, New York City), for plaintiff.

S. Hazard Gillespie, U. S. Atty., for S. D. New York; Robert J. Ward, Asst. U. S. Atty., Sherman J. Saxl, Asst. U. S. Atty., New York City, on brief, for defendant.

BICKS, District Judge.

Motion by plaintiff for a preliminary injunction staying the effective date of Civil Air Regulations Amendments 40–22 and 41–29 effective March 15, 1960 is denied. Any attempt to weigh the countervailing considerations of dollar loss to the approximately 40 pilots against the public[1] safety in air carrier operations borders on vulgarity. As against the determination made by Lt. Gen. Quesada, Commanding General of the 9th Tactical Air Command from the time of invasion of Normandy until the termination of air hostilities in Europe, with an accumulated experience of 12,000 (twelve thousand) hours as a pilot, now serving as Administrator of the Federal Aviation Agency, based in part on: (1) the views of the airlines as expressed by the Air Transport Association of America "that age 60 is a reasonable and judicious age limitation to use on an industry wide basis. Therefore, the airline industry recommends the adoption of the age 60 limitation"; (2) the report from the President of the Aerospace Medical Association: "Our Association supports the Federal Aviation Agency in making this regulation in the interest of public safety * * * Insight into the validity of this regulation in the realm of public safety is very well summarized in the editorial from the Washington Post of December 8, 1959, entitled, 'Pilot Age and Safety'[2]"; (3) the statement of Harry F. Guggenheim, aviation authority and chairman of the governing body of the Cornell-Guggenheim Aviation Safety Center, released May 19, 1959, wherein, in part, he observed: "There is, of course, a wide range of individual differences in ability in older years. One cannot say with certainty that a given man over 60 cannot safely pilot a modern transport plane, or that the cutoff point comes at this age or even younger. But there is increasing evidence that as men grow older, they unfortunately experience deterioration for which maturity, experience, judgment

1. According to a statistical projection prepared by the FAA, an average of 47 pilots 60 years of age and over will be serving on air carriers in the 12 month period from March 15, 1960, to March 15, 1961, and that an estimated 846,000 passengers will be carried by these pilots during that period.

2. See editorial p. 69 January 1960—Vol. 31, No. 1.

and skill cannot compensate adequately. We must keep in mind the ever-increasing performance characteristics of modern aircraft. Where higher speeds significantly reduce the time available to conduct a sequence of operations in emergencies there is no doubt that many of these older pilots can successfully continue flying their present aircraft, and even make transition to faster ships by completing more objective and rigid flight checks. *But there will be the occasional one who cannot—and this fact may not be discovered until there is a disastrous crash, which may take many lives.*" The Federal Aviation Agency, which regulates such matters, now has a minimum age limit of 23 for Class I pilot's certification, but no upper age. Mr. Guggenheim recommended that *the Agency act promptly to safeguard the public.* (Emphasis supplied.); (4) the views of Dr. Ross A. McFarland of the Harvard School of Public Health, and Dr. Brian O'Doherty published in "Handbook of Aging and the Individual", edited by James E. Birren (1959), Chapter XIV, Sub. V: "Aging as Related to Air Transportation", "The process of aging is of greater significance for airmen than for most occupational groups because of the exacting demands on their individual abilities. * * * Slowing reaction times for complex performance may reduce a pilot's ability to take the necessary actions required by modern, high speed jet aircraft. These changes may vary greatly from one person to another in both nature and extent, but even minor deterioration in many of the psychological and physiological functions may interact to produce a significant loss in general efficiency. Although it is not yet possible to establish a retirement age for civil airline pilots based on scientifically determined facts, enough is known about the aging process to suggest that these pilots should retire at about the age of 60"; (5) the well nigh accepted conclusion that, unfortunately, medical science at the present time does not have any means of accurately determining the physiological age of any specific individual nor is there any reliable method of predicting accurately the occurrence of sudden incapacitation due to heart attacks, strokes or debilitating seizures, we are: (a) cited to an 1953 article of Dr. Ross A. McFarland, the 1959 article referred to supra apparently having been overlooked; (b) told that the Aerospace Medical Association has not supported the proposal—again plaintiffs appear to have overlooked the statement of the president of that association prominently published in its Journal of January 1960; (c) cited to two arbitration awards made in proceedings had pursuant to collective bargaining agreements between the plaintiff association and Western Air Lines, Inc., in one instance, and National Airlines, Inc. in the other. The issue in each proceeding was whether the employer had the right under the particular agreement unilaterally to retire a pilot who had attained his 60th birthday. In both proceedings the answers were in the negative. The mere statement of the issues determined by the arbitrators demonstrates beyond cavil their inappositeness. In fact, in the American Airlines, Inc. proceeding, the opinion expressly states, inter alia: " * * * we do not pass on the desirability or efficacy of mandatory retirement age at 60 for pilots. *That was not the issue before us.* (Emphasis supplied). We are not asked to determine whether retirement at that age would best serve the interests of safety." The impartial chairman of the panel in the Western Air Lines, Inc. case, after first deciding that the language of the agreement did not literally authorize, nor in *haec verba* prohibit retirement at age 60, held that it did prohibit a change of working conditions which would impair rights in effect when the agreement became effective. "The question", he wrote, "then becomes whether the carrier had in effect at the commencement of this agreement a retirement policy. This is a question of fact which cannot be resolved in favor of the union." Having disposed of

the issue as submitted, he continued to consider "whether it is just and reasonable to presume that no pilot should be allowed to perform as a pilot after age 60." On this subject he found "some doubt even in the carrier's mind that an *exact* (emphasis supplied) chronological age automatically renders a pilot unfit", because, "the carrier apparently never intended to retire the grievant involved herein exactly at age 60, but rather planned to have him continue for about 3 months * * *." We are not informed of the proof before this arbitrator, but in appraising the weight to be given to it in this proceeding, it should be observed that at "some age—say 90—" he "would take judicial notice of impairment beyond all reason". Furthermore, and importantly—it does not appear that the public interest—in the person of a representative of the appropriate governmental agency—was represented. Asserted also is that the proposed regulation violates the Fifth Amendment rights of the plaintiffs. Their position, it would seem, is that they have a vested right, without limit as to duration, to serve as pilots on air carriers which may not be denied to them by changes in the regulations promulgated by the Federal Aviation Agency. The answer is that neither in statute under which, nor in the card or certificate which was issued them, is there authority for that position. The Federal Aviation Act of 1958 (49 U.S.C.A. §§ 1301–1542), imposes upon the defendant the duty and responsibility of promulgating rules and regulations to provide adequately for the highest possible degree of safety in air commerce. The Administrator is directed to exercise and perform his powers and duties under the Act in such manner as "will best tend to reduce or eliminate the *possibility* (emphasis supplied) of, or recurrence of, accidents in air transportation * * *." 49 U.S.C.A. § 1421(b). The act became effective December 31, 1958, and the Administrator promptly initiated a review of the then existing regulations. Such study revealed there was no maximum age limit prescribed for air pilots. The reason therefor becomes apparent when we consider the relative infancy of the industry and that in 1947 there were no active airline transport pilots who had attained the age of 60. The Agency records disclosed however that by the latter part of 1959 there would be approximately 35 pilots who would be over 60 and that by 1962 there would be more than 80 active carrier pilots in that age group. The fact that many airlines were changing over to the newer jet planes made the need for meeting this problem the more urgent. After extended investigation, conferences and study, General Quesada concluded that procrastination certainly was contra-indicated, if, indeed, not unfaithful to the trust imposed in him by the President, to administer the law with a view to effectuating its purposes. There then followed promulgation of the amendment sought to be enjoined, publication thereof in the Federal Register, and an invitation to all interested persons to participate in the making of the rule by submitting any material they desired, in writing or by oral argument. The period for so doing was extended an additional 30 days until September 28, 1959. All replies were carefully examined and considered. None of them indicated the availability of additional information which would be of help, nor any area for further study which might be explored productively within a reasonable period of time.

Plaintiffs' objections to the regulation are many. They urge, for instance, that the Administrator does not have sufficient statistical information upon which to predicate his finding that the regulation bear a reasonable relationship to public safety. As already indicated, the number of pilots who have attained the age of 60 is so small, relatively, to the total number of licensed pilots engaged in air carrier operations that statistics would be meaningless. The fundamental difference in approach to the problem is significant. General Quesada urges that accidents are not neces-

sarily the sole or even the most helpful source of information for the formulation of necessary safety rules. "I am sure," he states in his affidavit submitted on this application, "that the public deserves and Congress expects that in administering the safety rule making responsibility of the Federal Aviation Act of 1958, we should be something more than an agency which is merely responsive to disaster." While the Courts will not hesitate to strike down regulations not authorized or illegally promulgated, they will not attempt to substitute their judgment for that of the administrative agency. We deal here in an area where the public safety is in a very real way involved. The outstanding expertize of the Administrator, the apparent careful study dedicated to the problem and a proper regard for the separation of powers between the judicial and administrative branches of our government, suggest that interference with the effective date of the regulation would be usurpation.

The contention that the regulation constitutes an illegal intrusion by the Administrator into matters reserved for consideration by the airlines and the pilots overlooks that Congress constituted the Administrator the agent to protect the public interest. To the extent that results reached across the bargaining table are not consistent with the Congressional policy, they obviously must give way.

Ohio Oil Co. v. Conway, 1929, 279 U.S. 813, 49 S.Ct. 256, 73 L.Ed. 972; Chicago, Burlington & Quincy R. Co. v. Chicago Great Western R. R. Co., 8 Cir., 1951, 190 F.2d 361; Chicago Great Western Ry. Co. v. Chicago Burlington & Quincy R. Co., 8 Cir., 1952, 193 F.2d 975; and Benson Hotel Corp. v. Woods, 8 Cir., 1948, 168 F.2d 694, relied on by plaintiffs are to the effect that where the questions presented on an application for a preliminary injunction are grave and the injury to the movant will be certain and irreparable while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable or may be adequately indemnified by a bond, the injunction usually will be granted. Implicit in this contention is that we place a dollar value upon human life.

The other contentions pressed by movants have been considered and found unsound.

Unless plaintiffs propose to call the attention of the Court to materials not referred to in their papers and briefs considered on this motion, an application— should they be minded to make one—for a stay pending appeal will be and may be deemed denied.

So ordered.